IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| LENA TILLER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 5:05CV00352 SWW |
| | * | |
| MIKE FLUKER and | * | |
| RICELAND FOODS, INC., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lena Tiller ("Tiller") filed this action against her former employer Riceland

Foods, Inc. ("Riceland") and Mike Fluker ("Fluker"), one of her supervisors, alleging sexual

harassment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil

Rights Act of 1991, codified at 42 U.S.C. § 2000(e), and the Arkansas Civil Rights Act,

Ark.Code Ann. § 16-123-101 *et seq.,* ("ACRA"). She also asserts state law claims of intentional

infliction of emotion distress and false imprisonment against Fluker.[1]

Now before the Court are defendants' motions for summary judgment to which plaintiff

responded. After careful consideration, and for the reasons stated below, the Court determines

that defendants' motions should be granted.

**Background**

---

[1]The Court dismissed plaintiff's Title VII and ACRA claims against separate defendant Fluker in his
individual capacity. *See* docket entry 11.

Riceland hired Tiller on March 20, 2000, to work on the packing room floor in the

soybean division.[2]  In February 2004, she transferred to a hydrogenation operator position, also

in the soybean division.  Tiller worked 12-hour rotating shifts, four days on and four days off.

She worked on a crew that had two other employees and one shift supervisor.  Depending on

which shift she worked, Tiller's supervisor was either Fluker or Shelia Buffkin.  Fluker was her

supervisor three out of the four days of her shift.[3]

Tiller claims that in late February 2004, Fluker pinned her up against her locker, put his

hands around her stomach and tried to grab her breast.  He allegedly told her she needed "to give

him some."  Tiller said she told Fluker "I don't think so" and walked away.[4]  There were no

witnesses and Tiller did not report the incident to anyone at the time.  She says a couple days

later, she told two co-workers, Mike Amos and Phil Washington, about the incident after they

asked her why Fluker was following her everywhere.[5]

Tiller says that on another occasion, sometime between February and April 2004, Fluker

pulled her into the supervisor's office, shut the door, and stuck his hands down her pants.  Tiller

said she told Amos and Washington about the event the night it happened.[6]  The next incident

occurred in April when Fluker allegedly pulled Tiller into a cleaning closet, shut the door, and

"held [her] up against the wall in there and tried to take advantage of [her]."  She said she fought

---

[2]Fluker's Mot. Summ. J., Ex. 1 at 18.

[3]*Id.* at 19, 23.

[4]*Id.* at 29.

[5]*Id.* at 33-4.

[6]*Id.* at 37-9.

her way out of the closet and left.   Tiller says she told Amos about the incident.[7]   Tiller alleges

that on another occasion Fluker grabbed her by the arm and dragged her to the railroad control

room but she jerked loose and ran back upstairs.  She discussed the incident with Amos but did

not report it to anyone.  Tiller also claims Fluker made sexual comments to her on a daily basis

and that Amos and Washington overheard the comments[8]

Tiller claims that sometime in June 2004, she told Buffkin about Fluker's actions toward

her and asked her for advice.  She says Buffkin suggested she file a complaint with Ashley

Berry, Fluker's supervisor.[9]

Tiller asked for and was given paid time off from July 9 to July 20, 2004.[10]  As it turned

out,  July 4, 2004, was the last day Tiller worked at Riceland.[11]  Tiller says that during this

period of leave, she went to Iowa to look for a new job and was involved in an accident.[12]  She

called and notified Berry, who suggested Tiller take short-term disability.[13]

Tiller called Berry on July 22 and told him she was going to see a plastic surgeon on July

26 regarding her injuries from her accident.  In the same telephone conversation, Tiller told

Berry she was having personal problems with Fluker and wanted to change shifts.  Tiller did not

report any sexual harassment to Berry during this conversation, allegedly because he said he did

---

[7]*Id.* at 41-2.

[8]*Id.* at 42-5.

[9]*Id.* at 67-8.

[10]*Id.* at 52-3.

[11]*Id.* at 35.

[12]*Id.* at 51.

[13]*Id.* at 53-4.

not want to discuss it over the telephone.  According to Tiller, Berry told her he would try to get her on another shift.[14]

On July 28, 2004, Tiller went to the Riceland facility to see Berry.  She says she told him about the cleaning closet incident and one of the other incidents with Fluker.  Berry suggested she speak with Tony Carlock, the location manager in the soybean division, and Tiller says she told Carlock about the cleaning closet incident.  Carlock told Tiller she needed to talk to Lindy Rabeneck, Director of Human Resources.  Tiller says she told Rabeneck about all the incidents with Fluker that she could think of at the time.[15]  According to Tiller, Rabeneck told her she could not get Tiller a change of shift but could get her a different job, the only one posted, but it paid less.  Tiller testified Rabeneck told her Riceland would start an investigation but Tiller told her she could not take the pay cut and would have to quit.[16]  Tiller testified she thought the position was a permanent one and did not understand it to be a temporary assignment.[17]
 Two days later, Berry called Tiller to ask when she was coming back to work; Tiller told him she was not coming back.[18]

Tiller filed a charge of discrimination with the Equal Opportunity Commission ("EEOC") on December 13, 2004.  She received a right-to-sue letter on September 27, 2005, and filed an

---

[14]*Id.* at 56-8.

[15]*Id.* at 58-61.

[16]*Id.* at 61-2.

[17]*Id.* at 62.

[18]Riceland's Statement of Facts, Ex. 1B at 69.

action in federal court on December 23, 2005.  Defendants filed separate motions for summary

judgment on December 7, 2006.  This case is set for trial the week of June 18, 2007.

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must

demonstrate "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for

summary judgment, the non-moving party must "do more than simply show there is some

metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

475 U.S. 574, 586 (1986).  The non-moving party may not rest on mere allegations or denials of

his pleading but must "come forward with 'specific facts showing that there is a genuine issue

for trial.'"  *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed

fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable

jury could return a verdict for either party."  *RSBI Aerospace, Inc. v.  Affiiliated FM Ins. Co.,* 49

F.3d 399, 401 (8th Cir. 1995).  The inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the party opposing the motion.  *Matsushita,* 475 U.S. at 586

(citations omitted).

Summary judgment is a harsh remedy that should be granted only when the moving party

has established his right to judgment with such clarity as not to give rise to controversy.  *New*

*England Mutual Life Ins. Co. v. Null,* 554 F.2d 896, 901 (8th Cir. 1977).  However, summary

judgment motions "can be a tool of great utility in removing factually insubstantial cases from

crowded dockets, freeing courts' trial time for those that really do raise genuine issues of

material fact."  *Mt. Pleasant v. Associated Elec. Coop. Inc.,* 838 F.2d 268, 273 (8th Cir. 1988).

"Summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential

element of her case."  *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1205 (8th Cir. 1997).

**Discussion**

Riceland argues it is entitled to the affirmative defense set forth by the United States

Supreme Court in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998), and *Faragher v. City

of Boca Raton,* 524 U.S. 775 (1998).  In the alternative, Riceland asserts that Tiller is estopped

from asserting her claim because she failed to list it in her bankruptcy filing.  Fluker argues he is

entitled to summary judgment on Tiller's state law claims based on estoppel, statute of

limitations, and failure to state a claim.

**A.  Sexual Harassment Claim**

Pursuant to Title VII, it is unlawful for an employer to "fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Harassment of an employee

based on a prohibited factor (here, sex) is prohibited conduct under Title VII.  *Palesch v.

Missouri Comm'n on Human Rights,* 233 F.3d 560, 566 (8th Cir. 2000).  For Tiller to establish

that she was subject to hostile work environment sexual harassment, she must prove: (1) she

belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the

harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of

her employment.  *Id.*

In *Ellerth* and *Faragher*, the Supreme Court clarified the employer liability standard for

supervisory harassment of an employee under Title VII as follows:

> An employer is subject to vicarious liability to a victimized employee for an
> actionable hostile environment created by a supervisor with immediate (or
> successively higher) authority over the employee.  When no tangible employment
> action is taken, a defending employer may raise an affirmative defense to liability
> or damages . . . The defense comprises two necessary elements: (a) that the
> employer exercised reasonable care to prevent and correct promptly any sexually
> harassing behavior, and (b) that the plaintiff employee unreasonably failed to take
> advantage of any preventive or corrective opportunities provided by the employer
> or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807.  The affirmative defense, however, is not

available if the supervisor's harassment results in a tangible action, such as discharge, demotion,

or undesirable reassignment.  *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 808.

Riceland argues Tiller did not suffer any tangible employment action and it is entitled to

assert the *Ellerth/Faragher* affirmative defense.  Tiller contends the defense does not apply

because she suffered a tangible job action and because Riceland did not exercise reasonable care

to prevent and promptly correct the sexually harassing behavior.

Tiller asserts that she suffered a tangible job action when Riceland offered her another

position for less pay after she told management about her problems with Fluker.  The record is

undisputed that when Tiller met with Rabeneck, she advised Tiller that she would investigate the

matter and offered her a different job, which paid a lower hourly rate.  Tiller advised Berry, two

days later, that she was not returning to work.  Thus, Tiller argues, Fluker's harassment resulted

in a tangible job action, a demotion.

7

There is no evidence that Fluker, the alleged harasser and Tiller's supervisor, took a

tangible employment action against Tiller.  *See Ellerth*, 524 U.S. at 761-62 (when a supervisor

makes a tangible employment decision, there is assurance the injury could not have been

inflicted  absent the agency relation); *McCurdy v. Arkansas State Police,* 375 F.3d 762, 769 (8th

Cir. 2004)(based on the aided in the agency relation standard, employers always liable when a

supervisor takes a tangible employment action against a subordinate).  The Court finds Fluker

did not take a tangible job action against Tiller and, therefore, Riceland is entitled to assert the

affirmative defense.

Riceland  may assert the defense by proving the following two elements: (1) that the

employer exercised reasonable care to prevent and correct promptly any sexually harassing

behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any

preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

Riceland bears the burden of showing that the victim unreasonably failed to take available steps

to reduce the harm. *Okruhlik v. University of Arkansas,* 395 F.3d 872, 881 (8th Cir. 2005).

> While proof that an employer had promulgated an antiharassment policy with
> complaint procedure is not necessary in every instance as a matter of law, the
> need for a stated policy suitable to the employment circumstances may
> appropriately be addressed in any case when litigating the first element of the
> defense. And while proof that an employee failed to fulfill the corresponding
> obligation of reasonable care to avoid harm is not limited to showing an
> unreasonable failure to use any complaint procedure provided by the employer, a
> demonstration of such failure will normally suffice to satisfy the employer's
> burden under the second element of the defense.

*Faragher,* 524 U.S. 775, 807-808 (1998).  Riceland has a sexual harassment policy,[19] and Tiller

admits she was provided a copy of it.  The policy provides employees may present their concerns

---

[19]Riceland's Statement of Facts, Ex. 2.

to individuals other than their supervisors or other individuals in their chain of command.  The

policy suggests that employees file complaints verbally or in writing to the human resources

manager at their location, their location manager, or the director of human resources.

Tiller testified that at some time, probably in June 2004, she told Buffkin that Fluker was

physically assaulting her.  Tiller says:

> I wasn't reporting it to her.  I asked her how she would handle it if she was in my
> situation – would she go and talk to somebody above – say, like, Ashley, or
> maybe go talk to Lindy – would you think – do you think I would be able to keep
> my job if I went and talked to some of these people.  That's how it was talked
> about in that conversation.[20]

Tiller says Buffkin told her she did not want anything to do with it and advised Tiller to go talk

to Rabeneck.[21]  Tiller said that a few weeks later, she went on leave, and the reason she did not

go talk to Rabeneck was because she did not want "everybody prying into my private life." [22]

Now Tiller argues there is a genuine issue of fact regarding the sufficiency of Riceland's efforts

to prevent sexual harassment because Riceland, through Buffkin, took no action to remedy the

situation.

Riceland argues it knew nothing about Tiller's complaints until July 28, 2004, two days

before she decided not to return to work.  When Tiller did report Fluker's conduct to Rabeneck,

she told Tiller an investigation would be done, and offered Tiller another position.  There was no

in-depth discussion of the proposed position change, and when Berry contacted Tiller two days

later, she told him she was not coming back to work.

---

[20]*Id.*, Ex. 1B at 67.

[21]*Id.* at 68.

[22]*Id.* at 69.

The Court finds there is no genuine issue of material fact in dispute as to the reasonable care prong of the affirmative defense.  Tiller testified that when she spoke with Buffkin she was not reporting the offensive conduct but merely asking for advice.  When Tiller did report it, Riceland took reasonable actions to prevent harassment and prompt action to correct the problem by offering her another position.

The second element of the affirmative defense concerns whether Tiller unreasonably failed to take advantage of any preventative or corrective opportunities provided by Riceland or to otherwise avoid harm.  In addition to stating she did not want people prying into her private life, Tiller testified she feared that if she complained about Tiller, he would report her violation of the no-smoking policy.  She admits, however, that other employees violated the no-smoking policy, that other supervisors were aware that their employees were violating the policy, and nothing had ever been done to those employees.  "An employee has a duty under *Ellerth* to alert the employer to any allegedly hostile environment and 'an employee's subjective fears of confrontation, unpleasantness[ ] or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment.'" *Williams v. Missouri Dep't of Mental Health,* 407 F.3d 972, 977 (8th Cir. 2005).

The Court finds there is no genuine issue of material fact as to whether Tiller unreasonably delayed using Riceland's preventative or corrective processes.  According to her testimony, Tiller was subjected to sexual harassment from February 2004 until July 4, 2004, her last day of work.  She did not report Fluker's objectionable behavior until July 28, 2004, when she made those reports to Berry, Carlock, and Rabeneck.  According to Tiller, Rabeneck advised her that the allegations of harassment would be investigated and she was offered the only posted

position.  Tiller claims the alternative position would have resulted in a lower hourly rate, but

rather than discussing that in any depth with Rabeneck, Tiller left the facility and resigned two

days later.

The Court finds the undisputed facts show that Riceland fulfilled the second prong by

establishing that Tiller failed to take advantage of Riceland's preventative or corrective

opportunities by not reporting the harassment until approximately four months after it began and

not giving Riceland time to investigate her claims and correct any wrongdoing.[23]

**B.  Judicial Estoppel**

In the alternative, defendants urge the Court to grant summary judgment on plaintiff's

claims because she did not list her clams against them in her bankruptcy proceedings.  On April

20, 2004, while still employed with Riceland, Tiller filed for Chapter 13 bankruptcy protection.

She claimed she had too many payments and not enough money.  She testified twice in her

bankruptcy; the second time was in the Spring of 2005, when she converted her bankruptcy from

Chapter 13 to Chapter 7.  She was discharged from bankruptcy on April 12, 2005.[24]  Tiller had

filed a charge of discrimination in December 2004.  On September 27, 2005, the EEOC issued

the right-to-sue letter, and Tiller filed this lawsuit in December of 2005.

"'Judicial estoppel prevents a person who states facts under oath during the course of a

trial from denying those facts in a second suit, even though the parties in the second suit may not

---

[23] In fact, Riceland did conduct an investigation after Tiller's resignation.  *See* Riceland's
Statement of Facts, Ex. 5.

[24] *Id.*, Ex. 1A at 13-7.

be the same as those in the first.'" *Stallings v. Hussmann Corp.,* 447 F.3d 1041, 1047 (8ᵗʰ Cir.

2006)(citation omitted ).  The *Stallings* court stated:

> 'The circumstances under which judicial estoppel may appropriately be invoked
> are probably not reducible to any general formulation of principle.'  Three factors,
> while not 'an exhaustive formula for determining the applicability of judicial
> estoppel,' aid a court in determining whether to apply the doctrine.  The three
> factors are as follows:
>> First, a party's later position must be clearly inconsistent with its
>> earlier position.  Second, courts regularly inquire whether the party
>> has succeeded in persuading a court to accept that party's earlier
>> position, so that judicial acceptance of an inconsistent position in a
>> later proceeding would create the perception that either the first or
>> the second court was misled.  Absent success in a prior proceeding,
>> a party's later inconsistent position introduces no risk of
>> inconsistent court determinations, and thus poses little threat to
>> judicial integrity.  A third consideration is whether the party
>> seeking to assert an inconsistent position would derive an unfair
>> advantage or impose an unfair detriment on the opposing party if
>> not estopped.

447 F.3d at 1047 (citations omitted).

Defendants argue the legal effect of Tiller's discharge from bankruptcy under Chapter 7

as a no-asset discharge is that the bankruptcy court adopted her position, discharging her debts

on the information that she provided in the schedules.  They assert Tiller's failure to disclose her

cause of action against them as an asset is an admission that no such claims exist.

In *DeLeon v. Comcar Indus., Inc.,* 321 F.3d 1289 (8ᵗʰ Cir. 2003), the Eighth Circuit held

in a *per curiam* opinion that in both Chapter 7 and Chapter 13 cases, judicial estoppel bars a

plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff

both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy

court.  In *DeLeon*, the plaintiff filed a charge with the EEOC and about a year later filed a

Chapter 13 bankruptcy case.  He then received a right-to-sue letter and filed a discrimination and

12

retaliation lawsuit.  Two months after he filed the lawsuit, the bankruptcy court confirmed a

Chapter 13 plan. The Eighth Circuit held: "Because DeLeon certainly knew about his claim and

possessed a motive to conceal it because his amount of repayment would be less, we can infer

from the record his intent 'to make a mockery of the judicial system.'" 321 F.3d at 1292.  In

*Stallings*, the Eighth Circuit held that the district court abused its discretion in applying judicial

estoppel where Stallings was already a Chapter 13 debtor when he was terminated from his job;

Stallings did not allege defendants' wrongdoing caused him to file for bankruptcy; and

defendants were not Stallings' creditors.

       Applying the three factors here, the Court finds the doctrine of judicial estoppel is not

appropriate.  Unlike in *DeLeon*, Tiller had not filed a lawsuit prior to being discharged in

bankruptcy.  Further, like in *Stallings*, there are no allegations that defendants' wrongdoing

caused Tiller to file for bankruptcy or that they were her creditors. Therefore, the motions to

grant summary judgment on the basis of estoppel are denied

## C.  State Law Claims

       Fluker seeks summary judgment on Tiller's claims of false imprisonment and outrage.  In

*Adair v. Burgett,* 210 F.3d 378, 2000 WL 485256 (8th Cir. 2000) (unpublished per curiam), a

case which originated in this Court, the Eighth Circuit affirmed the grant of summary judgment

on the plaintiff's constitutional claims.  With regard to the state claim, however, the Eighth

Circuit, quoting *Birchem v. Knights of Columbus,* 116 F.3d 310, 314 (8th Cir. 1997), stated that

"'when federal and state claims are joined and the federal claims are dismissed on a motion for

summary judgment, the pendent state law claims are dismissed without prejudice to avoid

[n]eedless decisions of state law . . . as a matter of comity . . .'" *Adair, supra.*

Although § 1367 and *Birchem* appear to confer discretion on the Court to retain jurisdiction of Bennett's state law claim, the language of *Adair* is unequivocal.  Accordingly, based on *Adair,* the Court finds that Tiller's remaining state law claims should be dismissed without prejudice.

### Conclusion

IT IS THEREFORE ORDERED that the motions for summary judgment[25] are granted. Plaintiff's claims against Riceland are dismissed with prejudice.  Plaintiff's claims against Fluker are dismissed without prejudice.

DATED this 17th day of May 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[25]Docket entry 10.